IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-1041-D

| | |
|---|---|
| CRAIGE ROBINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| MOUNTAIRE FARMS OF ) | |
| NORTH CAROLINA CORP., ) | |
| ) | |
| Defendant. ) | |

On June 1, 2023, Craige Robinson ("Robinson" or "plaintiff") filed a complaint against Mountaire Farms of North Carolina Corp. ("Mountaire" or "defendant") alleging (1) unlawful termination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., (2) failure to accommodate in violation of the ADA, (3) a per se violation of the ADA, and (4) race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. See [D.E. 1] ¶¶ 31–60. On April 18, 2024, Mountaire moved for summary judgment [D.E. 22] and filed a memorandum in support [D.E. 23] and statement of material facts [D.E. 24]. On April 19, 2024, Mountaire filed an appendix of exhibits [D.E. 25]. On May 20, 2024, Robinson responded in opposition [D.E. 27] and filed a response statement of material facts [D.E. 28]. On June 3, 2024, Mountaire replied [D.E. 29]. As explained below, the court grants Mountaire's motion for summary judgment.

I.

In February 2016, Mountaire hired Robinson as an hourly employee. See Def.'s Statement of Material Facts ("DSMF") [D.E. 24] ¶ 1; Pl.'s Statement of Material Facts ("PSMF") [D.E. 28]

¶ 1. In June 2018, Mountaire promoted Robinson to rehang supervisor, a salaried position. See DSMF ¶ 2; PSMF ¶ 2. The rehang supervisor job description included the following responsibilities:

- Interviewing and training & development of employees;
- Planning production run a schedule for daily production;
- Ensure product meets customer specifications;
- Employee performance management and employee training;
- Ensuring machinery is operating efficiently and promptly communicates machine issues to [d]epartment [m]anager and [m]aintenance;
- Ensures employment safety, welfare, wellness and health;
- Maintains required records;
- Processes employee time sheets and absentee sheets;
- Monitors quality of incoming and outgoing products within department;
- Monitors usage of utilities and supplies;
- Ensures HACCP, GMP, SSOP, food safety[,] and safety standards are being followed and properly documented;
- Analyzes quality problems to determine root cause and communicates to [m]anagement;
- Develop and implement plans to improve quality and maintains system to measure quality;
- Establish goals and priorities and accomplish goals and objectives set by the [c]ompany;
- Operate within established budget;
- Effectively communicates plans, process changes or modifications, and [c]ompany vision and mission;
- Recognize and reward contributions and milestones;
- Speak and write clearly and effectively;
- Manage conflict;
- Ensure proper Personal Protective Equipment (PPE) is being utilized by each employee;
- Perform other duties as assigned.

[D.E. 25-3] 7–8. The work environment required:

- Exposure to extreme ranging temperatures;
- Exposure to wetness and humidity;
- Exposure to high noise level;
- Works with, around[,] and near machinery and high speed assembly lines;
- Required to occasionally reach, bend, stoop, push, pull, and lift;
- Required to frequently stand and walk.

2

See id. at 8.[1] Robinson's day-to-day responsibilities included supervising six lines of workers as they took chilled chickens off conveyors and rehung the chickens for further processing, managing staffing on the lines, completing administrative paperwork, and managing the ice house. Compare DSMF ¶ 4, with PSMF ¶ 4; see [D.E. 25-2] 5–9. To perform his duties, Robinson spent roughly 75 to 80 percent of his time walking the lines to ensure that the work proceeded smoothly and occasionally voluntarily worked on the line himself to allow his leads to perform other tasks. Compare DSMF ¶¶ 4–7, 9, with PSMF ¶¶ 4–7, 9; see [D.E. 25-2] 6. The floor Robinson supervised did not have a chair or any other seating. See DSMF ¶ 8; PSMF ¶ 8.

On August 29, 2021, an unknown assailant shot Robinson at a neighborhood cookout resulting in serious injuries to his elbow and hip. See DSMF ¶ 14; PSMF ¶ 14; see [D.E. 25-2] 44–46. Robinson's injuries required surgery, several days in the hospital, further surgery to remove stabilizing hardware, and an extended recovery period. See DSMF ¶ 15; PSMF ¶ 15. On August 30, 2021, Mountaire placed Robinson on FMLA leave for the gunshot injury. See DSMF ¶ 16; PSMF ¶ 16. On September 15, 2021, and October 5, 2021, Mountaire told Robinson that he would exhaust his FMLA leave on October 19, 2021. See DSMF ¶¶ 17, 19; PSMF ¶¶ 17, 19.[2] Mountaire also told Robinson that he would be eligible for long term disability benefits. See DSMF ¶ 18; PSMF ¶ 18.

On October 8, 2021, Robinson's doctor cleared him to return to work on October 20, 2021, with restrictions until the doctor reevaluated him on November 3, 2021. See DSMF ¶ 20; PSMF ¶ 20. Robinson could perform "seated work only with no use of the left arm and no

---

[1] Robinson alleges there are exhibits corroborating his statements concerning his job description from other employees. See, e.g., PSMF ¶ 10. These alleged exhibits are not in the record.

[2] Robinson had already used a significant amount of his FMLA leave after contracting COVID-19 twice. See DSMF ¶¶ 12–13; PSMF ¶¶ 12–13.

lifting/pushing/pulling greater than [five pounds] with [his] right arm." DSMF ¶ 20 (quotation omitted); see PSMF ¶ 20. On October 19, 2021, Robinson exhausted his FMLA leave. See DSMF ¶ 21; PSMF ¶ 21. On October 20, 2021, Robinson returned to work wearing a brace and still experiencing pain. See DSMF ¶ 22; PSMF ¶ 22; cf. DSMF ¶ 24; PSMF ¶ 24; [D.E. 24-1] 49; [D.E. 24-1] 146.

Robinson requested another leave of absence from November 2, 2021, to November 15, 2021. See DSMF ¶ 24; PSMF ¶ 24. Mountaire granted Robinson a personal leave of absence and allowed Robinson to use the full balance of his vacation time. See DSMF ¶ 21; PSMF ¶ 21. On November 5, 2021, Robinson's doctor maintained restrictions for seated work only, no use of Robinson's left arm, and no lifting, pushing, or pulling greater than five pounds with his right arm until the doctor reevaluated him on January 4, 2022. See DSMF ¶ 23; PSMF ¶ 23.

Mountaire generally follows an interactive process when an employee requests ADA accommodations to determine whether or how they can be met. Compare DSMF ¶ 34, with PSMF ¶ 34. As part of this process, following Robinson's restrictions update, Mountaire provided Robinson with a list of physical demands for his job including: (1) must be able to stand and walk for long periods of time continuously; (2) must be able to lift and carry up to 50 pounds, occasionally; (3) must be able to climb and descend stairs occasionally, including bending, kneeling, and reaching overhead; (4) must be able to push and pull occasionally; (5) must be able to handle a wet and cold environment; (6) must ensure all safety inspection sheets and PPE inspections are completed; (7) must monitor daily set-up of department; (8) must be able to effectively manage the day-to-day production process of the assigned area; and (9) must ensure all vacation requests, attendance reports, and lunch wash downs are completed. Compare DSMF ¶¶ 10, 25, with PSMF ¶¶ 10, 25, and [D.E. 25-3] 7–8. Robinson provided the update to his doctor.

See DSMF ¶ 25; PSMF ¶ 25.

On November 22, 2021, Robinson's doctor examined him again and revised his work restrictions to "no ladders; no use of left arm; no lifting/pushing/pulling greater than [five pounds] with [his] right arm; sedentary work with no standing/walking more than [one to four] hours a day and has to sit 15 minutes every hour," until the doctor reevaluated him on January 4, 2022. DSMF ¶ 26; see PSMF ¶ 26. The parties dispute whether Mountaire "engaged in multiple exchanges with Robinson and his [doctor] to determine what medical restrictions were necessary and whether it would be possible to accommodate those restrictions." Compare DSMF ¶ 26; with PSMF ¶ 26; see [D.E. 24-1] 54–55. Robinson took medications during this period for pain management, including oxycodone and gabapentin. Compare DSMF ¶ 28, with PSMF ¶ 28.

On November 23, 2021, Robinson met with Marcus Bell ("Bell"), the plant manager, and Jeff Covington ("Covington"), the plant superintendent. See DSMF ¶ 29; PSMF ¶ 29. After talking with Robinson, Bell took Robinson's medical paperwork to human resources and then instructed Robinson to go to human resources. See DSMF ¶ 33; PSMF ¶ 33; [D.E. 24-1] 61–62.

Bobbie Cogdell ("Cogdell"), Mountaire's director of occupational health, reviewed Robinson's restrictions and determined that Mountaire could not reasonably accommodate Robinson. Compare DSMF ¶ 36, with PSMF ¶ 36. Bell, Cogdell, David White ("White"), Mountaire's director of processing, Terry Williams ("Williams"), Mountaire's director of human resources, and Pamela Webster ("Webster"), Mountaire's complex human resources director, all determined that Mountaire could not reasonably accommodate Robinson in the rehang supervisor position. Compare DSMF ¶ 37, with PSMF ¶ 37. Furthermore, they determined that there were "no available, vacant positions that [Robinson] could perform consistent with" his doctor's restrictions. Compare DSMF ¶ 37, with PSMF ¶ 37. Thus, on November 30, 2021, due to

5

Robinson's restrictions, his exhaustion of all available leave, and the unavailability of any suitable vacant positions, Webster called Robinson to terminate his employment with Mountaire. Compare DSMF ¶ 38, with PSMF ¶ 38.

The parties dispute whether Mountaire could have reasonably accommodated Robinson. Compare DSMF ¶ 38, with PSMF ¶ 38. The parties agree that Mountaire provided accommodations to Covington when he broke an ankle and Jeff Maass when his doctor imposed a five-pound lifting restriction. Compare DSMF ¶¶ 42–44, with PSMF ¶¶ 42–44. Unlike Covington and Maass, Mountaire allowed Robinson to return to work once he had "no medically imposed work restrictions." Compl. [D.E. 1] ¶ 28; Ans. [D.E. 7] 28. Robinson asserts that he repeatedly met with Mountaire and requested reasonable accommodations, including using a stool or highchair, distributing information through lead workers who reported to him, and other ways. See [D.E. 27-1] ¶¶ 5, 15–21. Mountaire maintained that Robinson could only return to work without restrictions. See id. at ¶¶ 5–6, 22. Moreover, Maass and Covington were both managers whose jobs lacked a physical component. See DSMF ¶ 45; PSMF ¶ 45.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward

6

with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

A.

Robinson alleges ADA wrongful termination and failure-to-accommodate claims against Mountaire. See Compl. ¶¶ 31–46. Title I of the ADA applies to employment and prevents discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff may assert a Title I ADA claim against his employer based on (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. See Raytheon Co. v. Hernandez, 540 U.S. 44, 52–53 (2003); Manning v. N.C. State Univ., ___ F. Supp. 3d ___, 2024 WL 1183066, at *6 (E.D.N.C. Mar. 19, 2024); Prentice v.

7

North Carolina, No. 5:20-CT-3150, 2023 WL 2533164, at *4 (E.D.N.C. Mar. 3, 2023) (unpublished), aff'd sub nom. Prentice v. Haynes, No. 23-6243, 2023 WL 6442566 (4th Cir. Oct. 3, 2023) (per curiam) (unpublished); see also A Helping Hand, LLC v. Balt. Cnty., 515 F.3d 356, 362 (4th Cir. 2008). A plaintiff may prove such discrimination through direct evidence or through the McDonnell Douglas burden-shifting framework. See Raytheon, 540 U.S. at 49–50 & n.3; Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). Robinson has no direct evidence of illegal discrimination under the ADA and relies on the McDonnell Douglas burden-shifting framework.

Under the McDonnell Douglas framework: "(1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were merely a pretext for discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003).

8

To survive summary judgment on his ADA wrongful termination claim, Robinson must prove: "(1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (cleaned up); see Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 & n.9 (4th Cir. 2004); Rhoads v. F.D.I.C., 257 F.3d 373, 387 & n.11 (4th Cir. 2001); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001). To establish a prima facie case for a failure-to-accommodate claim, Robinson must prove: (1) he has a disability within the meaning of the ADA; (2) the employer had notice of his disability; (3) with a reasonable accommodation, he could perform the essential functions of the position; and (4) the employer refused to make such an accommodation. See, e.g., Cowgill v. First Data Techs., Inc., 41 F.4th 370, 378 (4th Cir. 2022); Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). A plaintiff's failure to prove any element of his prima facie case defeats his ADA claim. See Wilson, 717 F.3d at 345; see also EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 131–32 (1st Cir. 2014).

"The qualified individual criterion and the reasonable accommodation requirement are interrelated." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 88 (1st Cir. 2012) (quotation omitted). To establish either a wrongful termination or a failure-to-accommodate claim under the ADA, a plaintiff must show that he is a qualified individual. See Jessup v. Barnes Grp., 23 F.4th 360, 365 (4th Cir. 2020); Wilson, 717 F.3d at 344–45; Reynolds, 701 F.3d at 150; Rohan, 375 F.3d at 273 & n.9. Robinson bears the burden of demonstrating that he is a qualified individual. See Jessup, 23 F.4th at 365; Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 462 (4th Cir. 2012), abrogated on other grounds by Baird ex rel. Baird v. Rose, 192 F.3d 462 (4th Cir. 1999).

9

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1); see 29 C.F.R. § 1630.2(g)(1).

Determining whether an individual is a "qualified individual" focuses on "the time of the employment decision." Ross v. Ind. St. Teacher's Ass'n Ins. Trust, 159 F.3d 1001, 1013 (7th Cir. 1998) (quotation omitted). "Being qualified is determined in relation to the essential functions of the job, and reasonable accommodation by the employer does not require the elimination of an essential function of the job." Jones, 696 F.3d at 88 (quotation omitted). Likewise, the ADA does not require an employer to create a new job (or recreate an old job) to enable an employee with a disability to work. See, e.g., Mulloy v. Acushnet Co., 460 F.3d 141, 153–54 (1st Cir. 2006); Graves v. Finch Pruyn & Co. Inc., 457 F.3d 181, 186–87 (2d Cir. 2006); Lamb v. Qualex, Inc., 33 F. App'x 49, 59 (4th Cir. 2002) (unpublished); Smith v. Midland Brake, Inc., 180 F.3d 1154, 1175 (10th Cir. 1999) (en banc) (collecting cases); Shiring v. Runyon, 90 F.3d 827, 831–32 (3d Cir. 1996); Allen v. City of Raleigh, 140 F. Supp. 3d 470, 482–83 (E.D.N.C. 2015).

Under the ADA, "[a]n essential function is a fundamental job duty of the position at issue . . . . The term does not include marginal tasks but may encompass individual or idiosyncratic characteristics of the job." Jones, 696 F.3d at 88 (quotation omitted); Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994). "[C]onsideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written job description before advertising or interviewing applicants for the job, the description shall be

10

considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). In analyzing a job's essential functions, courts consider not only the employer's judgment and written job description but also the work experience of current and former incumbents who held the job. See Jones, 696 F.3d at 88; 29 C.F.R. § 1630.2(n).

The failure-to-accommodate inquiry generally proceeds in two steps: (1) whether the specific accommodation that the disabled employee requested was reasonable and (2) if the employer granted the reasonable accommodation, whether the disabled employee could perform the essential functions of the job. See Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 580–81 (4th Cir. 2015). Before addressing these two questions, especially in a case involving an alleged physical disability, the employer and the employee must understand the employee's specific, physical limitations in order to permit the employer and employee to assess any proposed accommodation. See id. at 581–82. After all, a reasonable accommodation "is connected to what the employer knows about the specific limitations affecting an employee who is a qualified individual with a disability." Jackson v. City of Chi., 414 F.3d 806, 813 (7th Cir. 2005); see 42 U.S.C. § 12112(b)(5)(A); Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996). Moreover, the ADA contemplates an open, interactive process between the employer and employee to "identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome the limitations." 29 C.F.R. § 1630.2(o)(3); see Kohl's, 774 F.3d at 132–33 (1st Cir. 2014); Wilson, 717 F.3d at 346–47 (4th Cir. 2013); Cloe v. City of Indianapolis, 712 F.3d 1171, 1178–79 (7th Cir. 2013); Hoppe v. Lewis Univ., 692 F.3d 833, 840–41 (7th Cir. 2012); Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (5th Cir. 2011); EEOC v. Agro Distribution, LLC, 555 F.3d 462, 471–72 (5th Cir. 2009); Conneen v MBNA Am. Bank, N.A., 334 F.3d 318, 329–34 (3d Cir. 2003); Loulseged v. Akzo Nobel Inc., 178 F.3d 731,

11

734–36 (5th Cir. 1999); Ross, 159 F.3d at 1013–15; Steffes v. Stepan Co., 144 F.3d 1070, 1072–73 (7th Cir. 1998); Beck, 75 F.3d at 1134–37.

A written description prepared before advertising or interviewing applicants is relevant to whether a particular function is essential. See 29 C.F.R. § 1630.2(n)(3)(ii). Nonetheless, "[t]he employer's judgment," "[t]he amount of time spend on the job performing the function," "[t]he consequences of not requiring the incumbent to perform the function," and "current work experience" are all relevant evidence of essential function. Id. at § 1630.2(n)(3)(i)-(vii). Moreover, the employer's business judgment merits "considerable deference from the courts." Elledge v. Lowe's Home Ctrs., 979 F.3d 1004, 1009 (4th Cir. 2020) (quotation omitted).

A court reviewing an ADA failure-to-accommodate claim must carefully review the interactive process. See, e.g., Hoppe, 692 F.3d at 840. "The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." Kohl's, 774 F.3d at 132. The interactive process requires bilateral cooperation, open communication, and good faith. See id. "If an employer engages in the interactive process with the employee in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for failure to provide reasonable accommodations." Id.; see Agro Distribution, LLC, 555 F.3d at 472; Jackson, 414 F.3d at 813–114; Loulseged, 178 F.3d at 738–40; Ross, 159 F.3d at 1014–15; Steffes, 144 F.3d at 1072–73; Beck, 75 F.3d at 1134–36. Situations exist, however, where no reasonable accommodation can ultimately suffice even after fully engaging in the interactive process. See, e.g., Elledge, 979 F.3d at 1012–13.

12

The ADA defines "reasonable accommodation" as one that "may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . and other similar accommodations . . . ." 42 U.S.C. § 12111(9); see Elledge, 979 F.3d at 1011. This definition is illustrative, not exhaustive, and sensitive to the particular circumstances of the case. See Elledge, 979 F.3d at 1011. Moreover, "the ADA does not require an employer to reassign any of the essential functions of a disabled employee, nor does it require an employer to hire additional employees to perform an essential function." Stephenson v. Pfizer, Inc., 641 F. App'x 214, 219 (4th Cir. 2016) (per curiam) (unpublished); see Martinson v. Kinney Shoe Corp., 104 F.3d 683, 687 (4th Cir. 1997). Rather, the employer must accommodate a disabled employee when an accommodation "would enable the employee to perform all of the essential functions of [his] position." Jacobs, 780 F.3d at 581 (emphasis omitted). Although the reasonableness analysis is often fact specific, "a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is reasonable on its face." Halpern, 669 F.3d at 464 (quotation omitted); U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401–02 (2002).

Mountaire argues that Robinson fails to demonstrate that he was a "qualified individual" with a disability under the ADA. [D.E. 23] 19–23. Robinson responds that Mountaire relies upon a "fabricated job description" to support its argument. [D.E. 27] 4; see also id. at 3–8. Mountaire replies that it created the functional description as part of the interactive process between Robinson, his doctor, and Mountaire and that the functional description reflects Mountaire's judgment concerning the essential functions of the rehang supervisor job. See [D.E. 29] 8–12.

13

Mountaire forecasts evidence that Robinson's restrictions from his doctor made it "impossible" for Robinson to perform the essential functions of his job as rehang supervisor. [D.E. 29] 5. During the informal interactive process between Robinson and Mountaire, Mountaire gave Robinson a summary of the functional requirements for the rehang supervisor position for Robinson to share with his doctor. See [D.E. 23] 17. Mountaire's description of the functional requirements of the rehang supervisor position comports with Robinson's testimony of his work experience in that position. Robinson spent 75 to 80 percent of his time walking the facility floor. See DSMF ¶ 7; PSMF ¶ 7; [D.E. 25-2] 8. Robinson's production area had no chair or other seating. See DSMF ¶ 8; PSMF ¶ 8; [D.E. 25-2] 14–15. In order to supervise his six lines, Robinson walked the lines to ensure that the work proceeded smoothly. Compare DSMF ¶ 4, with PSMF ¶ 4; see also [D.E. 25-2] 5. Effective management of the fast-paced production lines required Robinson to shift workers around the lines if some lines went down or needed to accelerate. See [D.E. 25-2] 8–9.

During several rounds of follow-up examinations, Robinson's doctor imposed functional restrictions for Robinson's potential return to work. See [D.E. 23] 16–17. At first, Robinson's doctor restricted him to only sedentary work but later revised that restriction to walking or standing no more than four hours a day, with fifteen minutes of rest every hour, no use of his left arm, no use of ladders, and no lifting, pushing, or pulling more than five pounds with his right arm. See id. The undisputed factual evidence demonstrates a direct conflict between the functional requirements for the rehang supervisor to be on his feet for a significant majority of the shift to effectively supervise the facility floor and Robinson's doctor-imposed restriction that he spend no more than four hours a day walking or standing with a fifteen minute rest every hour.

14

In opposition to this conclusion, Robinson argues that Mountaire did not prepare its functional job description "before advertising or interviewing applicants for the job" but rather created it after Robinson provided his medical restrictions. [D.E. 27] 3. Robinson also argues that Mountaire has not proven that he could not perform his supervisory duties as listed in the production supervisor job description summary. See id. at 4–8; [D.E. 27-3].

Mountaire's pre-hire position summary "required [Robinson] to frequently stand and walk." [D.E. 25-3] 8. Moreover, the employer's business judgment, Robinson's testimony about his work experience, and the consequences of not requiring the incumbent to perform these functions, comport with the conclusion that the rehang supervisor must stand or walk for a significant majority of the shift to perform the position's supervisory duties. See, e.g., Elledge, 979 F.3d at 1009–10. Furthermore, the court rejects Robinson's unsubstantiated contention that Mountaire fabricated the functional job description.

Robinson also argues that his surreptitious recordings of Bell prove that Bell disagreed with the functional job description Mountaire gave to Robinson. See [D.E. 27-1] ¶ 10. Robinson, however, cannot rely on inadmissible hearsay to create a genuine issue of material fact. See Fed. R. Civ. P. 56(c)(2); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); Vinal v. Fed. Nat. Mortg. Ass'n., 131 F. Supp. 3d 529, 536 (E.D.N.C. 2015). Moreover, Robinson's testimony that his normal work experience involved standing or walking for 75 to 80 percent of his shift defeats his argument that Mountaire fabricated the functional job description. Thus, even viewing the evidence in the light most favorable to Robinson, Robinson could not perform the essential functions of the rehang supervisor position without accommodation. Accordingly, the court must consider whether a reasonable accommodation was available to allow Robinson to perform the essential functions of the position. See, e.g., Halpern, 669 F.3d at 464.

15

Mountaire argues that Robinson fails to meet his burden to identify a reasonable accommodation. See [D.E. 23] 23–25. Robinson responds that he could have performed his essential functions on his own with his medical restrictions by sitting at a fixed location on the floor in a stool or highchair or by relying on his lead workers to relay his supervisory instructions. See [D.E. 27] 8, 14; [D.E. 27-1] ¶¶ 15–21. Mountaire replies that (1) the conclusions Robinson draws from his testimony are matters of opinion, not fact, (2) Robinson acknowledged that the floor area contained no seating, and (3) there was no vacant position for Robinson to fill. See [D.E. 29] 1–2.

Even viewing the evidence in the light most favorable to Robinson, the court rejects Robinson's arguments. Robinson's conclusory opinion that he could perform the essential functions with his medical restrictions does not suffice to rebut the facial incompatibility between his medical restrictions and the essential functions of the rehang supervisor position. See, e.g., Wai Man tom v. Hosp. Ventures, LLC, 980 F.3d 1027, 1041–42 (4th Cir. 2020). Moreover, Robinson fails to meet his burden to show that a seated, stationary supervisor could perform the essential functions of the rehang supervisor position. Notably, Robinson acknowledged that the facility floor contained no seating and testified that the fast-paced production area he supervised contained six production lines in a relatively small space. See [D.E. 25-2] 9, 14–15. Robinson forecast no evidence that a seated, stationary supervisor could safely fit within those working conditions. Finally, Robinson's suggestion that he could delegate tasks to team leads is not a reasonable accommodation. The ADA does not require Mountaire to reassign essential functions to other employees or alter the basic operations of the facility floor. See, e.g., Stephenson, 641 F. App'x at 219; EEOC v. Amego, Inc., 110 F.3d 135, 148 (1st Cir. 1997); Martinson, 104 F.3d at 687; Reigel v. Kaiser Found. Health Plan of N.C., 859 F. Supp. 963, 973 (E.D.N.C. 1994).

Robinson fails to identify a reasonable accommodation that could have enabled him to perform the essential functions of the rehang supervisor position. Thus, Robinson was not a qualified individual under the ADA. See, e.g., Jessup, 23 F.4th at 365–67. Accordingly, the court grants summary judgment to Mountaire on Robinson's ADA wrongful termination and failure-to-accommodate claims.

B.

Robinson also claims that Mountaire committed a per se ADA violation by maintaining a policy that an employee must obtain medical clearance from all restrictions before returning to work. See Compl. ¶ 40. Robinson argues that Mountaire admitted in its answer that it required Robinson to be cleared of all restrictions before he returned to work. See [D.E. 27] 20–22.

The court rejects Robinson's argument. Mountaire's admissions only pertain to Robinson and the particular circumstances of his restrictions and potential return to work. Compare Compl. ¶¶ 19, 22, 27–28, with Ans. ¶¶ 19, 22, 27–28. Mountaire's answer admits that Robinson could not return to work without medical clearance from his restrictions because of its determination that Robinson "could not perform the essential functions of his job with or without reasonable accommodations." Ans. ¶¶ 19, 22, 27, 28. These admissions are not evidence of a zero-accommodation policy. Moreover, even if the admissions were some evidence of such a policy, Robinson's testimony defeats this allegation. See DSMF ¶¶ 42–44; PSMF ¶¶ 42–44. Accordingly, the court grants summary judgment to Mountaire on Robinson's per se ADA violation claim.

C.

Alternatively, "the McDonnell Douglas presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case." Hicks, 509 U.S. at 506–07. "The

17

defendant must clearly set forth, through the introduction of admissible evidence," legitimate, nondiscriminatory reasons for the adverse employment action. Burdine, 450 U.S. at 255.

Mountaire forecasts evidence that Robinson had exhausted all available leave. Exhaustion of all available leave is a legitimate non-discriminatory reason for terminating an employee's employment. Cf. Vines v. Mountaire Farms, Inc., No. 23-1365, 2024 WL 1254174, at *5 (4th Cir. Mar. 25, 2024) (per curiam) (unpublished). Even viewing the evidence in the light most favorable to Robinson, Robinson fails to produce evidence that his termination was pretextual and discriminatory. See, e.g., Reeves, 530 U.S. at 143–44; King, 328 F.3d 145, 150–54. Accordingly, the court grants Mountaire summary judgment on Robinson's ADA claims.

D.

As for Robinson's Title VII race discrimination claim, Robinson did not respond to Mountaire's motion for summary judgment. See [D.E. 27]. Nevertheless, the court must determine if there are genuine issues of material fact that could support Robinson's claim. See Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 409 n.8 (4th Cir. 2010); Tyler v. Prince George's Cnty., Maryland, 16 F. App'x 191, 192 (4th Cir. 2001) (per curiam) (unpublished). After considering the evidence, Robinson's speculative contentions fail to establish a prima facie case of race discrimination. See Giles v. Nat'l R.R. Passenger Corp. (AMTRAK), 59 F.4th 696, 703–05 (4th Cir. 2023); Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 133–35 (4th Cir. 2002); see also Coleman v. Md. Court of Appeals, 626 F.3d 187, 190–91 (4th Cir. 2010), aff'd sub nom. Coleman v. Ct. of Appeals of Maryland, 566 U.S. 30 (2012). Accordingly, the court grants summary judgment to Mountaire on Robinson's Title VII race discrimination claim.

III.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 22].

Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 4 day of November, 2024.

                                            JAMES C. DEVER III
                                            United States District Judge